UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Maureen Rieger,                      :
        Plaintiff,                   :
                                     :
v.                                   :      Case No. 3:04cv244 (JBA)
                                     :
Orlor, Inc. dba Executive            :
Honda, Executive Auto Group,         :
Inc. and David Blackert,             :
        Defendants.                  :

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. # 55]

Plaintiff Maureen Rieger instituted this action seeking redress for alleged violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 et seq., Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60, and for negligent infliction of emotional distress. Her claims are based on allegations of defendants' failure to accommodate her disability, retaliation for seeking a reasonable accommodation, and eventual termination from her employment at Executive Honda.[1]

Defendants now move for summary judgment on four of plaintiff's claims against the corporate defendants Orlor, Inc. dba Executive Honda ("Orlor") and Executive Auto Group, Inc. ("Executive Auto"): discrimination on the basis of disability

_____

[1] See Amended Complaint [Doc. # 31].

1

(Count I), discrimination on the basis of being "regarded as" disabled (Count II), retaliation for requesting an accomodation of her claimed disability (Count III), and negligent infliction of emotional distress (Count VII).   Defendant Blackert also seeks summary judgment on all claims brought against him, namely violation of the ADEA (Count IV), violation of the CFEPA (Count VI), and negligent infliction of emotional distress (Count VII). For the reasons that follow, defendants' motion will be granted in part and denied in part.[2]

I.   **FACTUAL BACKGROUND**

Plaintiff Maureen Rieger, a female over 40 years of age, commenced employment at Executive Honda in May of 1999 as a sales consultant.[3]   In 2000 and 2001, she won awards for the number of cars she sold.[4]   At all times relevant to plaintiff's claims, David Blackert was the General Manager of Executive Honda and Executive Auto and had responsibility for overseeing the

---

[2]   Defendants do not move for summary judgment on the following counts:   the ADEA claim against the corporate defendants (Count IV), the Title VII claim against the corporate defendants (Count V), and the CFEPA claim against the corporate defendants (Count VI).

[3] Rieger Aff. [Doc. # 61, Ex. A] at ¶ 5; Rieger Pay Plan [Doc. # 61, Ex. E].

[4] Rieger Aff. at ¶ 6; 2000 Council of Sales Leadership [Doc. # 61, Ex. G]; 2001 Council of Sales Leadership [Doc. # 61, Ex. H].

dealership.[5]  Mark Altieri was Blackert's supervisor.[6]

In late 2001, plaintiff began having trouble sleeping through the night and on February 15, 2002, was diagnosed with insomnia by her physician, Dr. Janet Dickinson.[7]  Her insomnia was such that she would wake up after a couple hours of sleep and be awake for 2-3 hours before she was able to fall back asleep, and that some nights she was unable to sleep at all.[8]  She sleeps for approximately 6 hours a night, as opposed to the 8-9 hours she slept previously.[9]  Plaintiff contends that her insomnia substantially limits her ability to both sleep and work, impacting the latter because the insomnia affects her energy, comprehension, knowledge, patience, general attitude, and ability to deal with stress.[10]  She has been able to hold down jobs since she began suffering from insomnia and "it doesn't prohibit [her] from engaging in meaningful employment activity."[11]  Prior to the

---

[5] Blackert Pay Plan [Doc. # 61, Ex. F]; Altieri Dep. [Doc. # 61, Ex. J] at 23; Blackert Dep. [Doc. # 61, Ex. K] at 15.

[6] Altieri Dep. at 25.

[7] Rieger Aff. at ¶ 9, 14; Rieger Dep. [Doc. # 61, Ex. B] at 29-31.

[8] Rieger Aff. at ¶¶ 10-11; Rieger Dep. at 6, 29, 30-32.

[9] Rieger Aff. at ¶ 11; Rieger Dep. at 6, 32; accord Pl. Mem. [Doc. # 60] at 7.

[10] Rieger Aff. at ¶ 9-13; Rieger Dep. at 29, 36-37.

[11] Rieger Dep. at 68.

reduction of her hours at Executive Honda, plaintiff would call in late or call in sick when she had trouble sleeping.[12]

Having diagnosed plaintiff with insomnia, Dr. Dickinson gave plaintiff a 30-day prescription for Ambien, which she understood to be a trial.  Plaintiff took the medication only when she had 2-3 days of interrupted sleep, and it was effective.[13]  When plaintiff used up the prescribed medication, she did not ask Dr. Dickinson to renew the prescription because she did not like the medication's physical side effects, including daytime drowsiness.[14]  Dr. Dickinson neither instructed her to continue taking Ambien nor renewed her prescription at any time.[15]

In mid-February 2002, after her diagnosis, plaintiff provided defendant Blackert with a note from Dr. Dickinson stating that plaintiff suffered from insomnia and requesting that plaintiff's work week be reduced to 40 hours at least until her follow-up appointment in 4 weeks.[16]  The parties dispute the substance of Blackert's response.  Plaintiff testified he said

---

[12]   Rieger Dep. at 125-26, 145.

[13]  Rieger Dep. at 31-32.

[14]  Rieger Dep. at 33-35, 136-37; Ambien Information [Doc. # 61, Ex. N].

[15]  Rieger Aff. at ¶¶ 15, 28.

[16] 2/15/02 Dickinson Note [Doc. # 61, Ex. L]; Rieger Dep. 37-38, 41; Blackert Dep. 118-19.

4

"not yet" to her request to reduce her hours, and her request was not accommodated until sometime in March, 5-6 weeks after she gave Blackert Dr. Dickinson's note.[17]  Blackert testified that plaintiff's request was met, her hours were reduced, and plaintiff was told she could make her own schedule.[18]

Plaintiff saw Dr. Dickinson again on March 28, 2002, and Dickinson memorialized in her notes plaintiff's observation that "reduction in hours @ work have helped . . . feels less sleep deprivation.  On 42 hours and doing well."[19]  At this appointment, Dickinson wrote plaintiff another note stating that plaintiff needed to continue her 42 hour work week "for medical reasons at least until her next follow-up in 3 months."[20]  When confronted at deposition with the inconsistencies in her statements, given that she claimed no accommodation was made until 5-6 weeks after providing Blackert with Dickinson's first note in mid-February, but that she told Dickinson on March 28, 2002 that she was working a reduced work week, plaintiff offered no explanation, only maintained that no one ever told her that

---

[17]  Rieger Aff. at ¶¶ 20-21, 30-32; Rieger Dep. at 43-46, 49, 91, 146.

[18]  Blackert Dep. 78-79, 121-23, 133.

[19]  Progress Notes [Doc. # 61, Ex. O] at 4; see also Rieger Dep. at 34; accord Rieger Aff. at ¶¶ 27, 29.

[20]  3/28/02 Dickinson Note [Doc. # 61, Ex. M].

she could set her own schedule.[21]

Plaintiff maintains that after her hours were reduced, Blackert made her job difficult for her, with hostile behavior and by refusing to approve deals she offered to customers.[22]  As a result, she had trouble meeting her sales requirements and her income decreased.[23]  She went to Blackert for advice and Blackert informed her that an internet lead manager position was opening up with reduced hours.  He asked plaintiff to go to a training course for the position, which she did.[24]  Blackert told plaintiff that the pay for the internet lead manager position would be comparable to her income earned as a sales consultant.[25] After completing the training, Rieger accepted the position effective June 1, 2002, with a guaranteed pay plan for 90 days.[26]

Rieger testified that once in the position of internet lead manager, Blackert made working conditions "intolerable" by not providing her with her own desk or chair and by failing to give

---

[21] Rieger Dep. at 43,48-49, 67; accord Rieger Aff. at ¶ 22.

[22] Rieger Aff. at ¶¶ 17-18, 23-25; Rieger Dep. at 141-43.

[23] Rieger Dep. 52-54, 89-91.

[24] Rieger Dep. at 54-55, 59-60, 92; see also Blackert Dep. at 77 (testifying that Rieger asked Blackert to move her to the internet lead manager position).

[25] Rieger Aff. at ¶¶ 34-35; Rieger Dep. at 55-63, 68-69, 75.

[26] Id.

her the necessary internet access and passwords.[27]  Rieger was
also dissatisfied with the income she was realizing (after the
expiration of her 90-day guaranteed pay play), which was less
than she had made in sales.  She approached Blackert on the
subject (both in person and via memos and notes), but he was non-
responsive.[28]  Rieger believed the promised income was not
realized due to the poor working conditions, and because she was
not listed as internet lead manager on Executive Honda's
website.[29]  Rieger eventually complained about her working
conditions and reduced income to Altieri, who told her that her
expectations regarding compensation were unreasonable.[30]  At that
time, plaintiff also told Altieri of her interest in a service
writer position that was opening up,[31] and on September 30, 2002,
plaintiff was transferred to the new position.[32]   In October

---

[27] Rieger Aff. at ¶¶ 36-43; Rieger Dep. at 121-43.

[28] Rieger Aff. at ¶¶ 40, 44-45; Rieger Dep. at 68-82; Rieger
Memo to Blackert [Doc. # 61, Ex. C].

[29] Rieger Aff. at ¶¶ 36-43; Rieger Dep. at 76.

[30] Rieger Aff. at ¶¶ 41-43; Rieger Dep. at 82-87; Altieri
Dep. at 69-70, 79-81.

[31] Plaintiff testified that she did not ask about returning
to her former position in sales, because her desk had been filled
and she assumed it was not a possibility.  Rieger Dep. at 93.

[32] Rieger Aff. at ¶¶ 46-48; Rieger Dep. at 85-93; Altieri
Dep. at 81; Compensation Pay Plan [Doc. # 61, Ex. P].

2002, the service department experienced record-high sales.[33]

In November 2002, Rieger was told that Executive Honda was downsizing the service department and that she was being terminated because she had the least seniority in the department.[34]  Plaintiff observes that her seniority in the service department was only least by a matter of weeks, that she was the only one not in an introductory period of employment, and that she had more seniority at Executive Honda than the four other service advisors.[35]  While Altieri and Blackert stated that when plaintiff was terminated from the service department, she was offered her former job in sales,[36] plaintiff disputes that she was ever offered another position and was instead given unemployment paperwork to fill out.[37]

On November 21, 2002, plaintiff filed her discrimination charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and Equal Employment Opportunity Commission ("EEOC"), alleging, inter alia, discrimination on the

---

[33] Rieger Aff. at ¶ 49; Service Advisor Reports [Doc. # 61, Exs. Q & R].

[34]  Rieger Aff. at ¶¶ 50-54; Rieger Dep. at 96-98; Altieri Dep. at 106-08.

[35] Interrogatory Responses [Doc. # 61, Ex. S] at ¶¶ 80-81 & attachment; Employee Handbook [Doc. # 61, Ex. T] at 8.

[36] See Altieri Dep. at 106-11; Blackert Dep. at 108-09.

[37] Rieger Aff. at ¶ 54; Rieger Dep. at 95-96, 144-45; Unemployment Notice [Doc. # 61, Ex. D].

basis of physical disability, age, and gender.[38]

## II.  STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriquez v. City of N. Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."  Id. (citations omitted).  "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply

---

[38] See Affidavit of Illegal Discriminatory Practice and Charge of Discriminatory Practice [Doc. # 61, Ex. U].

cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to

defeat summary judgment, must then come forward with evidence
that would be sufficient to support a jury verdict in his or her
favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  Matsushita, 475 U.S. at 587.
However, a party opposing summary judgment "may not rest upon the
mere allegations or denials of the adverse party's pleading,"
Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the
material facts" is insufficient.  Matsushita, 475 U.S. at 586.

## III. DISCUSSION

## 1.   ADA Claims

### Exhaustion

Defendants argue that plaintiff pled neither a "regard as"
disabled discrimination claim nor a retaliation claim in her CHRO
or EEOC filings, and having failed to exhaust her administrative
remedies as to these claims, they must be dismissed.[39]
Plaintiff's pro se "Affidavit of Illegal Discriminatory Practice"
alleges, inter alia, that in March 2002, plaintiff was restricted
to a 40-42 hour work week by her physician because she was
suffering from insomnia, that on May 11, 2002 she was told she

---

[39] Def. Mem. [Doc. # 56] at 4-5.

would be attending training to learn a new managerial position, that her new position started on June 1, 2002, that when her new position did not yield the promised income she requested a different position and was transferred into the service department effective October 1, 2002, and that on November 8, 2002, she was told the department was being downsized and was laid off.[40]  Plaintiff charged discrimination on the basis of physical/medical disability, age, and sex.[41]

Because the enforcement provisions of Title VII of the Civil Rights Act of 1964 are applicable to actions brought under the ADA, See 42 U.S.C. § 12117(a), "under the ADA, as under Title VII, a plaintiff must file a charge of discrimination with the EEOC prior to commencing an action for employment discrimination in federal court."  Sotolongo v. N.Y. City Transit Auth., 63 F. Supp. 2d 353, 360 (S.D.N.Y.), aff'd 216 F.3d 1073 (2d Cir. 2000). "Exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII . . . statutory scheme[] and, as such, a precondition to bringing such claims in federal court."  Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001).  The Second Circuit has recognized, however, that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are

---

[40]  See Affidavit [Doc. # 61, Ex. U] at ¶¶ 7-13.

[41]  Id. at ¶ 14.

'reasonably related' to those that were filed with the agency."
Id. (citing cases).  The "reasonably related" standard has been
interpreted as "an allowance of loose pleading" and applies when
"the conduct complained of would fall within the scope of the
EEOC investigation which can reasonably be expected to grow out
of the charge that was made."  Deravin v. Kerik, 335 F.3d 195,
201 (2d Cir. 2003) (internal citation omitted).[42]  The standard
"is based on the recognition that EEOC charges frequently are
filled out by employees without the benefit of counsel and that
their primary purpose is to alert the EEOC to the discrimination
that a plaintiff claims [she] is suffering."  Id.

Turning first to plaintiff's perceived disability claim
(Count II), defendant's exhaustion argument must be rejected
because plaintiff included a charge of discrimination based on
physical/medical disability.[43]  The ADA defines "disability" as
either "a physical or mental impairment that substantially limits
one or more of the [individual's] major life activities," "a
record of such an impairment," or "being regarded as having such

---

[42]   The Second Circuit has recognized two other types of
claims that are considered to be "reasonably related" to the
charges in the EEOC complaint, neither of which are applicable
here:  (1) "a claim alleging retaliation by an employer against
an employee for filing an EEOC charge;" and (2) "a claim where
the plaintiff alleges further incidents of discrimination carried
out in precisely the same manner alleged in the EEOC charge."
Deravin, 335 F.3d at 201 n.3.

[43]  See Aff. at ¶ 14, page 3.

an impairment."  <u>See</u> 42 USC § 12102(2).  Thus, while plaintiff
did not delineate multiple theories of ADA violation (<u>i.e.</u>, that
she actually has a qualifying impairment, that she has a record
of having such an impairment, or that defendants regarded her as
having such an impairment), her general charge of discrimination
based on "disability" encompassed an ADA violation on any of
these theories.  Alternatively, plaintiff's perceived disability
claim is "reasonably related" to the general charge because an
investigation arising out of plaintiff's disability
discrimination charge would have entailed analysis of the same
alleged conduct, facts, and legal issues regardless of the theory
underlying the charge.[44]

Defendants' exhaustion argument as to plaintiff's
retaliation claim also must be rejected.  As the Second Circuit
has held, "[i]n determining whether claims are reasonably
related, the focus should be on the factual allegations made in
the EEOC charge itself, describing the discriminatory conduct
about which a plaintiff is grieving."  <u>Deravin</u>, 335 F.3d at 201.
"'[I]t is the substance of the charge and not its label that

---

[44] <u>See</u>, <u>e.g.</u>, <u>Tubens v. Police Dep't of the City of N.Y.</u>, 48
F. Supp. 2d 412, 417 (S.D.N.Y. 1999) (perceived disability claim
was reasonably related to a disability claim on the basis that
"[w]hether [plaintiff] was ultimately terminated because [of] an
actual disability or because [defendant] incorrectly perceived
[her] to be disabled, the scope of the EEOC investigation would
remain substantially the same [and] [b]oth claims require an
analysis of the same facts and turn upon similar legal issues").

controls.'" <u>Id</u>. (citing <u>Alonzo v. Chase Manhattan Bank, N.A.</u>, 25
F. Supp. 2d 455, 458 (S.D.N.Y. 1998)).  Thus, although plaintiff
did not "label" her charge as including a complaint of
retaliation, plaintiff alleged the conduct underlying her
retaliation claim in this action, <u>i.e.</u>, that she requested an
accommodation for her insomnia, that she was thereafter
transferred to a lower-paying position, and that she was then
terminated.  Thus, an investigation would reasonably have been
expected to include inquiry into this purportedly retaliatory
conduct and defendants were given notice that plaintiff was
charging them with such conduct.[45]  Thus, both of defendants'
exhaustion arguments are rejected and their Motion for Summary
Judgment on Counts II and III on this basis is denied.

    <u>Discrimination</u>

    Defendants argue that summary judgment is warranted on
plaintiff's ADA claims (Counts I and II) because plaintiff is not
"disabled" within the meaning of the ADA, and even if a disputed
issue of fact existed as to whether she was disabled, summary
judgment should be granted because plaintiff's requested

---

    [45]  The one case cited by defendants in support of their
exhaustion argument seems inapplicable.  <u>Craft v. Yellow Freight
Sys., Inc.</u>, 139 F.3d 911, 1998 WL 72783 (10th Cir. 1998)
(unpublished), concluded that "where a retaliatory act occurs
prior to the filing of [a] charge and the employee fails to
allege the retaliatory act or retaliation claim in the charge,
the retaliatory act ordinarily will not reasonably relate to the
charge."  <u>Id</u>. at *3.  Here, plaintiff did allege the claimed
"retaliatory act[s]" in her charge.

accommodation (reduced hours) was provided.

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, . . . or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). "To make out a prima facie case under the ADA, a plaintiff must establish that: (1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability." Giordano v. City of N.Y., 274 F.3d 740, 748 (2d Cir. 2001) (internal quotation omitted).  The ADA also requires covered employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).

The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities . . .;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  The Supreme Court has articulated a three-part analysis for determining whether a plaintiff has a

16

disability under the first subsection of the ADA definition.  <u>See</u> <u>Bragdon v. Abbott</u>, 524 U.S. 624, 631 (1998).  "First, we consider whether [plaintiff has] a physical [or mental] impairment. Second, we identify the life activity upon which [plaintiff] relies . . . and determine whether it constitutes a major life activity under the ADA.  Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity."  <u>Id.</u>; <u>accord</u> <u>Colwell v. Suffolk Cty. Police</u> <u>Dep't</u>, 158 F.3d 635, 641 (2d Cir. 1998).

The record is clear that plaintiff was diagnosed with the "impairment" of insomnia, and Second Circuit case law holds that both sleeping and working, the life activities identified by plaintiff, constitute "major life activities."  <u>See</u> <u>Colwell</u>, 158 F.3d at 642-43; <u>MacGovern v. Hamilton Sunstrand Corp.</u>, 170 F. Supp. 2d 301, 308-09 (D. Conn. 2001), <u>aff'd</u> 50 Fed. Appx. 59 (2d Cir. 2002).  Thus, the central issue in dispute relates to the third step in the <u>Bragdon</u> analysis, <u>i.e.</u>, whether plaintiff has shown that her insomnia "substantially limits" her life activities of sleeping and working.

The relevant EEOC regulations define "substantially limits" as:

   (i)  Unable to perform a major life activity that the
       average person in the general population can
       perform; or
   (ii) Significantly restricted as to the condition,
       manner or duration under which an individual can
       perform a particular major life activity as

> compared to the condition, manner, or duration
> under which the average person in the general
> population can perform that same major life
> activity.

29 C.F.R. § 1630.2(j)(1).  The regulations suggest considering

the following factors in determining whether a plaintiff's

impairment substantially limits a major life activity: "(i) [t]he

nature and severity of the impairment; (ii) [t]he duration or

expected duration of the impairment; and (iii) [t]he permanent or

long term impact, or the expected permanent or long term impact

of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).

As acknowledged by the Second Circuit in Colwell, the

"regulations also give guidance for determining whether an

individual is substantially limited in the major life activity of

'working,'" providing that the ability to work is substantially

limited if the plaintiff is "significantly restricted in the

ability to perform either a class of jobs or a broad range of

jobs in various classes as compared to the average person having

comparable training, skills and abilities."  Colwell, 150 F.3d at

643; 29 C.F.R. § 1630.2(j)(3)(i).  The regulations "make clear

that 'the inability to perform in a single, particular job does

not constitute a substantial limitation in the major life

activity of working.'"  Colwell, 150 F.3d at 643 (citing 29

C.F.R. § 1630.2(j)(3)(ii)).

Plaintiff has not demonstrated the existence of a disputed

issue of material fact as to whether her insomnia substantially

limits her in the recognized major life activity of sleeping.  As
the Second Circuit noted in Colwell, "[d]ifficulty sleeping is
extremely widespread."  158 F.3d at 644.  In Colwell, the court
found that plaintiff's evidence that he took medication as a
sleep aid and that he usually got "a tough night's sleep" did not
suffice to show that "his affliction [was] any worse than is
suffered by a large portion of the nation's adult population" and
he therefore "failed to establish that the degree of limitation
he suffer[ed] [was] substantial."  Id.  By contrast, in Knorr v.
Pepsico Food Services, 97cv1819 (NPM), 1999 WL 200685 (N.D.N.Y.
Apr. 8, 1999), the court denied defendant's motion for summary
judgment where plaintiff testified that she slept no more than
one to one and a half hours per night, her physician and
therapist had documented her sleep deprivation and insomnia, and
plaintiff presented evidence regarding the number of hours that
an average person sleeps per night.  1999 WL 200685, at *9.

In Zale v. Sikorsky Aircraft Corporation, 97cv125 (JBA),
2000 WL 306943 (D. Conn. Feb 7, 2000), this Court reviewed
Colwell and Knorr and granted defendant's motion for summary
judgment, where plaintiff testified that he frequently got no
more than three hours of sleep per night which his counsel
characterized as a "serious encroachment" and "not the run of the
mill sleeplessness suffered by the average population."  2000 WL
306943, at *7-8 ("Mr. Zale's evidence on the limitations on his

sleeping habits is more akin to the record pronounced inadequate
in Colwell.").  This Court noted that plaintiff "provide[d] no
evidence from which the Court could infer that his sleeping
difficulties are comparatively greater than the situational
sleeping difficulties experienced by the general population," and
determined that the Court could not "measure the plaintiff's
impairment against a hypothetical construct" of what plaintiff's
counsel claims is a "normal" amount of sleep per night.  Id. at
*8 ("Unlike the plaintiff in Knorr, there has been no showing by
Mr. Zale regarding the sleeping habits of the average person in
the general population, nor has he attempted to distinguish his
'frequent' receipt of three hours a night from the garden-variety
insomnia described by the Second Circuit in Colwell.").

     The Court concludes that the record presented by plaintiff
in this case tracks more closely those in Crowley and Zale.
Plaintiff testified that her insomnia was a "repetitive
condition" and that it happened "[e]very so often"; she
characterized the condition as waking up after 2-3 hours of sleep
and being awake for 3-4 hours until she was able to fall back
asleep.[46]  She also stated that she generally gets about 6 hours
of sleep per night and that "from time to time" she is unable to
sleep at all.[47]  Upon diagnosing plaintiff with insomnia, Dr.

---

[46] Rieger Dep. at 29.

[47] Rieger Aff. at ¶¶ 10-11; Rieger Dep. at 6, 32.

Dickinson wrote two notes, the first in February 2002 indicating that plaintiff's work week needed to be reduced due to her insomnia until her follow-up appointment in four weeks, and the second in late March 2002 indicating that plaintiff needed to continue her 42 hour work week for at least another 3 months.[48] There is no medical evidence from which the quantity or quality of sleep could be assessed (e.g. a sleep study).  On the basis of the evidence that is offered, the Court concludes that plaintiff's condition has not been shown to be either severe enough or of a sufficiently prolonged duration to constitute a substantial limitation on her ability to sleep under the ADA.[49]

Additionally, as in Colwell and Zale, plaintiff submits no evidence from which it could be concluded that her sleeping

---

[48] 2/15/02 Dickinson Note; 3/28/02 Dickinson Note.

[49]   A number of other courts have even held that plaintiffs able to sleep less than the 6 hours Rieger states she generally sleeps were not "substantially limited" from sleeping under the ADA.  Nuzum v. Ozark Auto. Distributors, Inc., 432 F.3d 839, 848 (8th Cir. 2005) (inability to sleep for more than 5 hours a night was not a substantial limitation on the major life activity of sleeping); Boerst v. General Mills Operations, Inc., 25 Fed. Appx. 403, 407 (6th Cir. 2002) (getting 2-4 hours of sleep per night "while inconvenient, lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA"); Pack v. Kmart Corp., 166 F.3d 1300, 1306 (10th Cir. 1999) (plaintiff not substantially limited where she would "toss and turn all night long" and sometimes would not get more than 2-3 hours of sleep and there was no indication that plaintiff's sleep problems were severe, long term, or had a permanent impact); Lajeunesse v. Great Atlantic & Pacific Tea Co., 160 F. Supp. 2d 324, 332 (D. Conn. 2001) (summary judgment granted where plaintiff was unable to sleep more than 4-5 hours per night).

difficulties are comparatively greater than those experienced by
the general population.[50]   See also Dean v. Westchester Cty.
P.R.C., 309 F. Supp. 2d 587, 594 (S.D.N.Y. 2004) (dismissing
plaintiff's claim where plaintiff had "not alleged that his
affliction is any worse than is suffered by a large portion of
the nation's population").   Moreover, Dr. Dickinson's notes,
prescribing a reduced work week for four months, give no
indication that plaintiff's impairment was either permanent or
that it would have a long-term impact.   See Pack, 166 F.3d at
1306.   Thus, plaintiff has not adduced sufficient evidence from
which a jury could reasonably infer that her insomnia was an ADA
covered impairment that substantially limited her major life
activity of sleeping.[51]

---

[50]   In fact, the six hours sleep plaintiff testified she
typically gets per night is within the range claimed to be
"average" by the plaintiff in Knorr.   1999 WL 200685, at *9 ("As
alleged by plaintiff, the average person in the general
population gets between five to eight hours of sleep per
night.").

[51] Defendants contend that the Court should take into account
the fact that plaintiff was initially prescribed Ambien which
helped to alleviate her insomnia.   While the Supreme Court held
in Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999),
that courts should consider whether "a person is taking measures
to correct for, or mitigate, a physical or mental impairment"
when assessing whether that person is "substantially limited" and
thus "disabled" under the ADA, that holding does not mandate that
this Court take into consideration plaintiff's expired
prescription for Ambien.   The Supreme Court in Sutton reasoned
that the condition of the plaintiff at the time suit was brought
("presently") was the relevant condition and that therefore
whether a plaintiff was taking medications to alleviate an
impairment could be factored into the "substantially limited"

Likewise, plaintiff has not shown a disputed issue of material fact as to whether her insomnia substantially limited her ability to work.  As noted above, the Second Circuit defined what constitutes a substantial limitation on the major life activity of working in <u>Colwell</u>:

> The ability to work is substantially limited (among other indicia) if the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  The regulations make clear that "the inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working."

158 F.3d at 643 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  In this case, by both plaintiff's own account and Dr. Dickinson's diagnosis, plaintiff was not "significantly restricted" from "working" so long as her work week was reduced to 40-42 hours. Upon diagnosing plaintiff with insomnia, Dr. Dickinson did not advise plaintiff not to work, or even that she could not continue to work in her present position, only that she should reduce her hours to 40-42 per week.  By plaintiff's own admission her

---

analysis.  527 U.S. at 482-83.  However, the Supreme Court's use of "presently," and its direction that courts should also consider "any negative side effects suffered by an individual resulting from the use of mitigating measures," <u>id</u>. at 484, suggests that in a case such as this one, where plaintiff experienced unpleasant side effects from a mitigating medication and discontinued use of it, consideration of the potential impact of such medication on plaintiff's impairment would be unjustified.  Thus, the Court has not included in its analysis the potential salutary effect of sleep aids on plaintiff's impairment.

insomnia "doesn't prohibit [her] from engaging in meaningful employment activity."[52]  She continued to perform her sales job at Executive Honda for four months and subsequently performed the jobs of lead internet manager and service writer until her termination.  Post-termination, plaintiff has held jobs as a mortgage loan officer and grounds crew member.[53]  Thus, plaintiff has not produced evidence from which reasonable jurors could conclude that her insomnia substantially limited her ability to engage in the activity of working so as to constitute a "disability" under the ADA.

Plaintiff also claims that even if she does not have an actual impairment that substantially limits a major life activity, disputed issues of fact exist as to whether she was regarded as having such an impairment by defendants, alternatively meeting the definition of "disability" under the ADA.  42 U.S.C. § 12102(2)(C).  To satisfy this statutory definition a plaintiff must show: (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  Giordano, 274 F.3d at 748 (citing Sutton 527 U.S. at

---

[52] Rieger Dep. at 68.

[53] Rieger Dep. at 11, 114-17.

489).  Thus, plaintiff's "regarded as" claim "turns on the
employer's perception of the employee and is therefore a question
of intent, not whether the employee has a disability."  <u>Colwell</u>,
158 F.3d at 646 (internal quotation omitted).

The record lacks any evidence that there were any
misperceptions on the part of defendants regarding plaintiff's
condition, much less that her employer saw her as disabled within
the meaning of the ADA, that is, perceived her as having an
impairment that substantially limits a major life activity.  <u>See</u>
<u>Munck v. New Haven Savings Bank</u>, 251 F. Supp. 2d 1078, 1084 (D.
Conn. 2003) (citing <u>Colwell</u>, 158 F.3d at 646).  For the reasons
described above, even if plaintiff could demonstrate that
defendants perceived her as having insomnia which limited her
ability to sleep more than six hours per night, and "from time to
time" to sleep at all, such evidence does not constitute an
impairment that substantially limits the activity of sleeping.
Likewise, the record contains no evidence that defendants
perceived plaintiff's insomnia as substantially limiting her from
working, particularly since they offered her other positions
after she informed them about her insomnia.  <u>See</u> <u>Colwell</u>, 158
F.3d at 646-47 ("To prove that they were regarded as
substantially limited in their ability to work, [plaintiffs] bore
the burden of proving that [defendant] perceived them to be
incapable of working in a broad range of jobs suitable for

25

persons of their age, experience, and training," and transfer to "light duty status" did not mean that defendant regarded plaintiffs as disabled); <u>Cousins v. Howell Corp.</u>, 113 F. Supp. 2d 262, 272-73 (D. Conn. 2000) (finding "no evidence that defendant regarded plaintiff as unable to perform a wide range of jobs" where defendant offered plaintiff "another position with many of her former job duties and responsibilities, although not all of them"). Thus, plaintiff has failed to produce evidence which could prove her perceived disability claim.

While plaintiff also claims that she qualifies as having "a record" of an impairment that substantially limits one or more major life activities, <u>see</u> 42 U.S.C. § 12102(2)(B), she cannot survive summary judgment on this theory either. Like the other two definitions of disability in the ADA, in order to satisfy this subsection, "[t]he record must be one that shows an impairment that satisfies the ADA." <u>Colwell</u>, 158 F.3d at 645. Even assuming that Dr. Dickinson's notes and report are sufficient to constitute a "record," they do not constitute a record of an impairment that satisfies the ADA for the reasons described above.

Thus, summary judgment as to plaintiff's ADA claims in Counts I and II is granted.[54]

---

[54] Defendants do not move for summary judgment on plaintiff's CFEPA claim, and the Second Circuit has held that the standard for qualification as "physically disabled" under CFEPA is broader

Retaliation

Plaintiff claims her termination was in retaliation for her request for accommodation (Count III).  See 42 U.S.C. § 12203. The elements of an ADA retaliation claim are:

> (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action.

Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 148-49 (2d Cir. 2002).  Retaliation claims are analyzed under the same burden-shifting framework established for Title VII cases.  See Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

Defendants do not appear to dispute that plaintiff satisfies the first three elements of the prima facie case, and it is well established that seeking a reasonable accommodation for a disability constitutes protected activity, see Weixel, 287 F.3d at 149, even if plaintiff actually did not have a disability within the meaning of the ADA, so long as her belief that she was disabled when she requested the accommodation was reasonable and the request was made in good faith.  See Munck, 251 F. Supp. 2d at 1087 ("Several courts have held that a non-disabled employee is nonetheless protected against retaliation if the employee made

_____

than the "disability" standard under the ADA.  See Beason v. United Techs. Corp., 337 F.3d 271, 276-78 (2d Cir. 2003).  The CFEPA, however, does not cover perceived disability claims.  Id. at 279.

a good faith request for a reasonable accommodation.") (citing, inter alia, Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224 (2d Cir. 2000)).

The parties are at odds, however, on whether plaintiff has adduced sufficient evidence to show a causal connection between the protected activity and the adverse action.  The Court finds that she has.  "In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001).  While nearly 9 months elapsed between when plaintiff first gave her doctor's note to Blackert and when plaintiff was terminated from her service writer position, courts have "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal . . . right and an allegedly retaliatory action," id. at 554 & n.5 (citing cases), and many courts have found that time periods of 6 months to a year between the time of the protected conduct and the time of the adverse employment action suggest a causal relationship between the two.[55]

_____

[55] See, e.g., Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (8 month gap between filing of EEOC complaint and retaliatory action suggested a causal

Moreover, plaintiff testified that during the time period between when she first presented Blackert with a request for an accommodation and when she was terminated, her working conditions were made "intolerable" (corroborated by Altieri, who testified that plaintiff complained to him about her working conditions), which is suggestive of other retaliatory conduct linking her accommodation request and her ultimate termination.   Thus, plaintiff has adduced sufficient evidence for a prima facie case of retaliation.

The burden now shifts to defendants to articulate a legitimate nondiscriminatory reason for plaintiff's termination, which they have done, i.e., that they were downsizing plaintiff's department and plaintiff was terminated because she had the least seniority.   Moreover, defendants claim that when plaintiff was terminated, she was offered the opportunity to return to her former job in sales.   Plaintiff claims that the real reason for her termination was retaliatory animus and points to evidence that she was barely the least senior person in the service department, had more overall seniority at Executive Honda than

_____

relationship); Suggs v. Port Authority of N.Y. & N.J., 97civ4026 (RPP), 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (termination six months after plaintiff filed an EEOC charge was "sufficiently close in time to raise an inference of retaliation"); Bernhardt v. Interbank of N.Y., 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (eleven months between protected activity and termination might suggest causal link where defendant had reasons for delaying termination).

anyone else in the department, and that during her tenure in the department, they experienced record-high sales.  Moreover, she denies that she was ever told she could return to her old job in sales, and states that instead she was given unemployment paperwork.  Thus, plaintiff has presented sufficient evidence from which a jury could reasonably conclude that defendants' reasons for plaintiff's termination were pretextual and that the real reason was retaliatory.  Thus, defendants' motion for summary judgment on plaintiff's retaliation claim (Count III) is denied.

**2.   Claims Against Defendant Blackert**

Defendant Blackert seeks summary judgment on plaintiff's claims in Counts IV (ADEA claim), VI (CFEPA claim), and VII (negligent infliction of emotional distress claim) against him, contending that there is no individual liability for supervisory employees.  See Def. Mem. at 5 (citing cases).  Plaintiff concedes, as she must, that there is no individual liability under CFEPA .  Perodeau v. Hartford, 259 Conn. 729, 761 (Conn. 2002).  Plaintiff also acknowledges "that a majority of courts have held that supervisory employees cannot be subjected to personal liability" under the ADEA, but argues that there is an applicable exception to this rule.  Additionally, plaintiff argues that there is no rule precluding individual liability for negligent infliction of emotional distress arising in the context

of termination.  Id. at 20.

The ADEA precludes individual liability.  See Martin v.
Chem. Bank, 129 F.3d 114, 1997 WL 701359 (2d Cir. 1997).[56]  While
plaintiff is correct that a few courts have employed an exception
to this general rule and have allowed suits to proceed against
individual defendants in their representative or official
capacities,[57] the majority of courts have declined to apply such
an exception, reasoning that culpable individual acts are
attributable to employers and thus allowing suits against
individuals is unnecessary, and criticizing the reasoning of
those courts that have invoked an exception to this rule.[58]

---

[56] Cf. Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000)
(per curiam) ("[I]ndividuals are not subject to liability under
Title VII."); Tomka v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d
Cir. 1995) (no individual Title VII liability for mid-level
regional managers employed by a private corporation), abrogated
on other grounds, Burlington Indus., Inc. v. Ellerth, 524 U.S.
742 (1998).

[57] See, e.g., Wray v. Edward Blank Assocs., Inc., 924 F.
Supp. 498, 504 (S.D.N.Y. 1996); Leykis v. NYP Holdings, Inc., 899
F. Supp. 986, 990 (E.D.N.Y. 1995).

[58] See, e.g., Tishman v. The Associated Press, No. 05civ4278
(GEL), 2005 WL 3466022, at *2-3 (S.D.N.Y. Dec. 16, 2005) (noting
that there is "some, albeit scant, authority" for plaintiff's
position, but declining to adopt the position reasoning that
"[t]o the extent that plaintiffs seek some way of actually
holding the individual defendants liable for damages, their
argument is flatly inconsistent with established circuit law
[and] [t]o the extent that the theory is designed simply as a way
of attributing the acts of the individual defendants to [the
corporate defendant], it is entirely unnecessary," noting
"[t]here is no basis for keeping as defendants individuals who
have no personal liability - Congress simply has not authorized
it"); Cooper v. Morgenthau, 99civ11946 (WHP), 2001 WL 868003, at

Thus, in keeping with the majority approach, and because Congress has not authorized individual liability in ADEA suits, the Court declines to apply the exception advocated by plaintiff and therefore grants defendant's motion as to plaintiff's ADEA claim (Count IV) against defendant Blackert.

Plaintiff's negligent infliction of emotional distress claim (Count VII) will also be dismissed, but not based on defendants' argument that there can be no individual liability for negligent infliction of emotional distress.  The Connecticut Supreme Court has disallowed negligent infliction of emotional distress claims "arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment."  Perodeau, 259 Conn. at 772 (emphasis added); accord Parsons v. United Techs. Corp., 243 Conn. 66, 88 (Conn. 1997) ("[N]egligent infliction of emotional distress in the employment context arises only where it is based upon

---

*4 (S.D.N.Y. July 31, 2001) (noting that "while the court of appeals has not yet ruled on the issue, the weight of authority in this circuit . . . holds that neither Title VII nor the ADEA permits an individual to be held liable in his official capacity) (citing cases); Gray v. Shearson Lehman Bros., Inc., 947 F. Supp. 132, 135-36 (S.D.N.Y. 1996) (abrogating its earlier decision on individual liability and adopting the reasoning that while "official capacity" suits were originally permitted to avoid Eleventh Amendment issues, those issues are not present in employment discrimination cases involving private employers, noting that "the function of courts is to provide a remedy against those that Congress has determined should be held liable for the plaintiff's damages, not to affix moral blame," and concluding that Congress has not authorized such "official capacity" suits against individual defendants).

unreasonable conduct of the defendant in the termination

process.") (internal quotation omitted).[59]

Plaintiff argues that "the termination process itself took

place over a period of approximately one month," and includes,

inter alia, that "Altieri represented to Plaintiff that the

service department was being expanded and would need a new

service writer, which was a position that would meet her

financial needs," that "Defendants made this representation to

Plaintiff for the purpose of inducing her to accept a position in

the service department as a service writer, which she did," that

"Defendants' transfer of Plaintiff to a position as service

writer in the service department was not made in good faith and

was fabricated solely for the purpose of terminating Plaintiff,"

that "[o]n or about November 8, 2002, Plaintiff was asked to pick

up her paycheck and when she did, Defendants summarily terminated

Plaintiff's employment," and that "Defendants represented to

Plaintiff that she was terminated because the service department

was downsizing and Plaintiff had the least seniority [and] falsly

claimed that she was being laid off for economic reasons."  Pl.

Supp. Br. [Doc. # 72] at 2-3 (citing Amended Complaint ¶¶ 49-51,

57-60).  Plaintiff compares her case to Chen v. Pitney Bowes

Corp., 195 F. Supp. 2d 368 (D. Conn. 2002), in which this Court

---

[59] Upon request from the Court, the parties provided
supplemental briefing regarding the applicability of this
standard to plaintiff's claim.  See [Docs. ## 70, 72].

denied defendant's motion for summary judgment on plaintiff's
negligent infliction claim, where plaintiff excitedly returned to
work after a long leave of absence for mental health treatment,
relying on defendant's false instruction that he should return,
where defendant had instead already decided to terminate the
plaintiff and did so immediately upon his reporting back to work,
causing plaintiff to relapse.  <u>Id</u>. at 371-2, 378-79.

The facts of plaintiff's case are distinguishable from those
in <u>Chen</u>, because the conduct underlying Chen's claim was directly
related to his termination – namely, that defendant had already
decided to fire Chen, but did not notify Chen of that decision
while he was on disability leave, and brought him back only to
tell him of his termination.  195 F. Supp. 2d at 378-79.  By
contrast, the only action alleged by Rieger that actually
occurred in the process of termination was when she was asked to
pick up her paycheck, she was terminated.  Nothing in the record
suggests that this act was done in a manner supporting a
negligent infliction claim.[60]  Plaintiff's claim that defendants'
pre-termination acts and representations were a set-up and
pretextual predicate leading to termination does not change the

---

[60] <u>See</u> <u>Gomes v. Commercial Union Ins. Co.</u>, 258 Conn. 603, 619
(Conn. 2001) ("In order to recover on a claim of negligent
infliction of emotional distress, the plaintiff must prove that
the defendant should have realized that its conduct involved an
unreasonable risk of causing emotional distress and that
distress, if it were caused, might result in illness or bodily
harm.").

nature of the defendants' conduct, only their motivation for their conduct.[61]

Thus, because plaintiff alleges no conduct to support a negligent infliction of emotional distress claim occurring "in the termination of employment," plaintiff's claim (Count VII) is dismissed as against Blackert and the corporate defendants.[62]

## IV.   CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. # 55] is GRANTED as to plaintiff's ADA claims (Counts I and II), DENIED as to plaintiff's retaliation claim (Count III), GRANTED as to plaintiff's ADEA and CFEPA claims (Counts IV and VI) against individual defendant Blackert, and

---

[61] See also Sacco v. George Schmitt & Co., No. 97CV2180 (AWT), 1998 WL 823039, at *5 (D. Conn. Sept. 14, 1998) (plaintiff's allegations concerning defendant's conduct spanning a four-month period – beginning with the defendant's insistence that plaintiff operate a press by himself, which led to plaintiff's injuring his back and defendant subsequently threatening to terminate plaintiff and suspending him without pay, and including defendant's warning that plaintiff's refusal to sign an accident analysis form would constitute insubordination, which plaintiff refused to sign resulting in his termination – did not constitute allegations concerning conduct during the termination process, but instead conduct leading to the termination process).

[62] See Brunson v. Bayer Corp., 237 F. Supp. 2d 192, 208 (D. Conn. 2002) (concluding that although the holding in Perodeau specifically eliminated negligent infliction claims arising in the context of an ongoing employment relationship against individual defendants, there is "no reason to read [Perodeau] as nonetheless permitting recovery against the corporate employer") (citing other cases also extending the Perodeau rule to corporate defendants).

GRANTED as to plaintiff's negligent infliction of emotional

distress claim (Count VII), as described above.

                    IT IS SO ORDERED.

                    _____/s/_____
                    Janet Bond Arterton
                    United States District Judge

**Dated at New Haven, Connecticut this 29th day of March 2006.**

36